**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| VOICES FOR INDEPENDENCE, (VFI), | ) | Civil Action No.:  06-78 Erie |
| on behalf of themselves and all others | ) | |
| similarly situated | ) | |
| Plaintiffs | ) | |
| v. | ) | |
| | ) | |
| COMMONWEALTH OF PENNSYLVANIA | ) | |
| DEPARTMENT OF TRANSPORTATION; | ) | |
| ALLEN D. BIEHLER, P.E., in his official | ) | |
| capacity as Secretary of Transportation of | ) | |
| the Commonwealth of Pennsylvania | ) | |
| Defendants | ) | |


**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION RESPECTING**
**PENNDOT'S VIOLATIONS OF SETTLEMENT AGREEMENTS**
**REGARDING OMITTED RAMPS**


I.          INTRODUCTION


           It is undisputed that, at all times relevant to this motion, all settlement orders have

mandated that PennDOT install curb ramps in accordance with the ADAAG when it resurfaced

state roads.


           **B. Ramps Must be Installed at all Intersections.**
           (1) .   .   . PennDOT shall ensure that within the
           Cities of Erie and Meadville newly constructed or
           altered State streets, roads and highways shall
           contain curb ramps crossing the State streets, roads
           and highways at all intersections containing curbs or
           other barriers to entry from a street level pedestrian
           walkway, in order to provide access from those

intersections to the walkways.  Each such project
shall comply with all Americans with Disability Act
requirements, including 28 C.F.R. § 35.151 (b), (c),
(i)(l) and (i)(2), and 28 C.F.R., Part 36, App. A, the
ADAAG.

\*              \*              \*              \*

**F. Accessibility Standards and Guidelines Controlling
Settlement Order.**   According to the Settlement Orders
already existing in this lawsuit (Documents 23 and 24),
all portions of State streets, roads and highways newly
constructed or otherwise altered by PennDOT shall comply
with all Americans With Disability Act requirements,
including 28 C.F.R. §35.151(b), ( c), (i)(1) and (i)(2) and
28 C.F.R., Part 36, App. A, the ADAAG.

*See Fourth Settlement [Doc. 56], Sections II (B)(1) and (F); Also see Meadville Settlement, Dec.
22, 2006 [Doc 22] para. 2: Erie Settlement, April 27, 2007 [Doc. 32], para. 2(a).*

Both the Meadville Settlement Agreement of December 22, 2006 (at paragraph 2)

and the Erie Settlement Agreement of April 27, 2007 (at paragraph 2(a)), incorporated by

reference as a controlling standard 28 C.F.R. §35.151(e)(1), now renumbered §35.151(i)(1) as

referenced above in the Fourth Settlement Agreement. This regulation unequivocally states:

Newly constructed or altered streets, roads
and highways must contain curb ramps or other sloped
areas at any intersection having curbs or other barriers
to entry from a street level pedestrian walkway.

2.

Pursuant to the Settlement Orders, during years 2007 through 2011, inside the Cities of Erie and Meadville, PennDOT successfully installed some 1,029 curb ramps.

Despite all of this, during its resurfacing projects in 2007-2010, PennDOT admittedly violated the Settlement Agreement, and thus the law, by failing to install a nearly a 1,000 curb ramps—the "omitted" curb ramps.  "PennDOT acknowledges that it did not install the omitted curb ramps." *PennDOT brief, p. 2. [Doc. 64]*.  The size and breadth of these violations gave rise to the Fourth Settlement Agreement, which was negotiated to cure PennDOT's breach of its obligations. "PennDOT has acknowledged that the majority of these omitted curb ramps need to be installed and have agreed to do so in the most recent settlement agreements, as time and resources permit." *Id.*

The parties agreed that to rectify these violations, a reliable and complete listing of all of the omitted ramps was crucial.  The Fourth Settlement thus requires PennDOT to prepare and file a comprehensive listing of each intersection it resurfaced during years 2007-2010, and to list each location where—because PennDOT failed to install all required curb ramps—a "curb or other barrier" remains where that corner intersects with a street level pedestrian walkway.  *Fourth Settlement, Section II (C)(1).  [Doc. 56]*

> C.  Installing ramps omitted during work performed since 2007
>
> (1)  In a written report, PennDOT shall identify all State street, road and highway intersections newly constructed or altered by PennDOT in the Cities of Erie and Meadville during the years 2007 through

3.

> 2010, where curb ramps were not installed at each
> such intersection.  The report shall specify at those
> intersections each location still containing curbs or
> other barriers to entry from a street level pedestrian
> walkway.  PennDOT shall file with the Court and
> Plaintiffs' Counsel a report comprehensively listing
> each such location no later than thirty days from
> today.

*Fourth Settlement Agreement, Section II(C)(1) [Doc. 56].*

  In disregard of these obligations and delaying further the remediation of its past

violations, PennDOT then violated the Fourth Settlement Agreement by failing to file this listing.

Only after Plaintiffs filed a motion to enforce the terms of the agreement, did PennDOT file a

report.  (Doc. 62-1 and 62-2).[1]  On June 20, 2012, PennDOT filed a document that purported to

provide the information required under the Fourth Settlement Agreement.  *See Doc. 62 and its*

*attachments.*

  This listing identified a total of 686 omitted ramps within the City of Erie that

PennDOT had planned to now install.  However, this listing also identified some 26 intersections

where PennDOT indicated it would not install the omitted ramps.  Likewise, this document

identified 262 ramps to be installed in the City of Meadville that were previously omitted and it

identified 5 intersections where PennDOT indicated that it would not install the missing ramps.[2]

---

[1]  Defendant filed the report 111 days late.
[2]  PennDOT also declared that its construction of the omitted ramps would not satisfy the
specifications that had been followed in 2007-2010 with respect to ramp cross slope.  This new policy
violates the Settlement Agreements and applicable law and is the subject of Plaintiffs' motion to enforce.
[Doc. 59].

Subsequently, on July 11, 2012, PennDOT produced another document entitled "Barriers to Remain, City of Erie" which identified some 49 locations where barriers to access existed but where PennDOT refused to install required ramps.  A copy of this listing is attached to Plaintiffs' Motion as Exhibit 1.  The *Barriers to Remain* listing also contained some 11 new locations where ramps had been omitted but were not included in the report filed by PennDOT on June 20, 2012.  PennDOT's failure to include these intersections in its report was yet another violation of the Fourth Settlement Agreement.

TIME TABLE FOR RAMPS NOT IN DISPUTE

With regard to the combined total of 948 missing ramps PennDOT has agreed to install, PennDOT has verbally *promised* that it will install almost all of these curb ramps by the end of 2013.  Plaintiffs urge the Court to order PennDOT to install each of these curb ramps now, without delay and to complete all of these ramps no later than October 1, 2013.  And, to ensure that PennDOT completes the installation as soon as possible, Plaintiffs request that the Court order PennDOT to file monthly progress reports.

These monthly reports shall state, at a minimum, PennDOT's progress in meeting the construction dates and the number and location of each of the curb ramps installed that month, the measurements of each curb ramp (in the format used already by PennDOT in its 2007-2011 Annual Reports), and PennDOT's best estimate of the number of the 948 curb ramps to be installed within the next 30 days.  Even during the winter months, when curb ramps are not

actually being installed, PennDOT's report should detail all steps taken that month to ensure that each remaining curb ramp will be installed as quickly as possible.  Given PennDOT's history, such close monitoring is a necessity.

<u>PENNDOT MUST INSTALL ALL OF THE  DISPUTED RAMPS</u>

PennDOT's report of June 20, 2012, identifies locations where ramps should have been, but were not, installed during resurfacing work.  It also identifies a combined total of 31 intersections ( intersections colored green in the listing) where the listing states that there will be "No Action State."  PennDOT explains that this means that it refuses to install these particular missing ramps.  PennDOT's *Barriers to Remain* listing contains additional locations where PennDOT also refuses to install omitted ramps.

The Settlement Agreements provide a detailed process that must be followed when PennDOT seeks to deviate from its construction obligations under those agreements.  This process, known by the parties by the acronym TIF ("Technically Infeasible Form"), is described as follows:

> At any time during the term of this Settlement Agreement that . . . PennDOT believes that site conditions at any particular intersection scheduled for improvement prohibits or makes unnecessary construction or alteration in full compliance with each of the standards set forth above . . . [PennDOT], within 15 days of discovery of the

6.

matter, shall inform Plaintiffs' counsel in writing. This writing shall list which engineer(s) have reviewed the intersection, the location of the intersection, and a statement of which standard(s) cannot be met, why not, and how much of a deviation from the standard(s) is contemplated. Unless due to factors beyond PennDOT's control, this writing should also include  a sketch of any proposed deviant curb ramp, with the proposed final measurements for each slope, cross slope, and lip. If Plaintiffs do not object in writing to the notice within 15 days from the postmark of the written notification, . . . PennDOT may presume that the deviation is acceptable to the Plaintiffs and may begin construction of that particular curb ramp.

*Settlement Agreement December 22, 2006, ¶12 [Doc. 22].  See also Settlement Agreement April 19, 2007, ¶13 [Doc. 33].*

The Settlement Agreements incorporate the ADAAG's "technically infeasible" standard as the determinative test for any claim by PennDOT that a curb ramp cannot be constructed.

**Potential Exceptions Pursuant to 28 C.F.R. Part 36, App. A §4.1.6(j).**  The parties agree that the ADAAG at 28 C.F.R. Part 36, App. A §4.1.6 and 4.1.1.5(a); 4.1.6(3); and 28 C.F.R. 35.151(c), to the extent applicable, shall be the standard to judge the validity of any defendant assertions that construction or alterations cannot or are not required to meet in full the construction and design standards set out in the paragraphs above.

7.

*Settlement Agreement December 22, 2006, ¶11 [Doc. 22].  See also Settlement Agreement April*

*19, 2007, ¶12 [Doc. 33].*

This technically infeasible exemption is very narrow and it applies only when site

conditions make it virtually impossible to comply with the ADAAG construction standards.

> Technically infeasible.  With respect to an alteration
> of a building or a facility, something that has the
> little likelihood of being accomplished because
> existing structural conditions would require
> removing or altering a load-bearing member that is
> an essential part of the structural frame; or because
> other existing or physical or site constraints prohibit
> modification or addition of elements, spaces, or
> features that are in full and strict compliance with
> the minimum requirements.

*28 C.F.R. Part 36, App. A §4.1.6(j) Definitions.*

If it is possible to construct the curb ramp to meet the ADAAG and to thereby

remove a barrier to full access, PennDOT must do it.  Even the cost of making the resurfaced

street fully accessible by installing compliant curb ramps is not a consideration for the

determination of technical infeasibility.

> Technical infeasibility will likely, in practice, often
> overlap with particularly excessive costs; that is, the more
> technically difficult an alteration, the more expensive
> it is likely to be. But the ADA does contemplate that,

> in general, if a public entity cannot afford to make alterations to a public transit facility that include making the altered portions accessible, it should not make alterations at all. "Congress felt that it was discriminatory to the disabled to enhance or improve an existing facility without making it fully accessible to those previously excluded." *Kinney, 9 F.3d at 1073*. Although this is a demanding requirement, it is consistent with the ADA's nature as a far-reaching anti-discrimination statute.

*D.I.A. v. SEPTA, 635 F.3d 87, 95 fn. 10 (3rd Cir. 2011)*

With regard to PennDOT's duty to cure its past violations arising from the 2007-2010 omitted ramps, the Fourth Settlement Agreement provides a similar process to be followed if PennDOT contends that a barrier should not be removed.

> In the rare circumstance that PennDOT believes that on a State street, road or highway it should leave in place a curb or other barrier to entry to a pedestrian level walkway, or that it should replace an existing ramp with a curb or other barrier, it must first adhere to the following procedure:
>
> a.  Written Notice.  PennDOT shall within ten days of discovering the alleged site conditions which it believes supports such action, inform Plaintiffs' counsel in writing via e-mail and hard copy.  This writing shall identify the engineer(s) who have reviewed the intersection(s), shall identify the location of the intersection(s), and shall provide a statement of the circumstances which PennDOT believes supports its proposed action.  The Parties shall allow 15 days from the postmark or e-mail notification to resolve the matter.

9.

b.  Unresolved Disputes.  In the event that the
Parties cannot resolve a dispute concerning
removing barriers at any such intersection(s), the
Parties expressly agree that the Court expressly
retains jurisdiction to resolve any disputes under the
terms of this Order, as well as the Court's earlier
Settlement Agreement Orders.  Either party may file
a motion with the Court to address any unresolved
issues.  Any final resolution under this paragraph
shall be treated as a decision by the Court.

*Settlement Agreement January 30, 2012, ¶4 [Doc. 56]*.

PennDOT has failed to comply with the foregoing processes and, thus, PennDOT

has once more breached its clear obligations under the Fourth Settlement Agreement.  Instead of

timely providing the required notices ("within ten days of discovering the alleged site

conditions"), together with a detailed explanation of the conditions that supposedly make

compliance technically infeasible, PennDOT has only declared its intent to refuse to install

ramps.  Since PennDOT has ignored these processes without just cause, it would be prejudicial to

Plaintiffs to grant PennDOT additional time now to engage in that process. During such further

delays, the Plaintiffs will continue to be deprived of the access rights that were first guaranteed in

1992 with the passage of the ADA.

As a result of PennDOT's repeated violations of the settlement agreements, the

Plaintiffs respectfully request that this Honorable Court issue an order compelling PennDOT to

install all of these disputed ramps as soon as possible, and certainly no later than the end of 2013.

At this late date, PennDOT should not now be permitted to further delay full accessibility.


### PENNDOT MUST COMPLY WITH ADAAG


Based upon the authorities cited in Plaintiffs' Motion To Enforce Settlement

Agreement with PennDOT [Doc. 59] and Plaintiffs' brief filed in support of that motion [Doc.

67], Plaintiffs also request that the Court issue an order requiring that PennDOT construct all

such omitted ramps to be in compliance with the relevant provisions of the ADAAG, as

identified and set forth in the Settlement Agreements entered in this matter.


Furthermore, there is an unresolved dispute between the parties as to whether

PennDOT must install a total of six compliant ramps at unsignalized "T" intersections involving

city-owned roadways.  _See_ _Fourth Settlement Agreement ¶II(B)(2)._  At these intersections, the

city streets terminate at the state road or highway and there is no traffic-control device for

vehicles traveling on the state road.  A total of four ramps could be installed to permit the

crossing of the two legs of the state road and a total of two ramps to cross the city street.

PennDOT has rejected any obligation to install all six ramps when it resurfaces a state highway at

such "T" intersections.  PennDOT has argued that it is "good enough" to provide only partial

accessibility at such intersections.

The omitted ramp listings (June 20, 2012 list and the *Barriers to Remain* list) do not reveal whether PennDOT is leaving barriers in place at "T" intersections based upon its position that ADA accessibility does not require full access and does not mandate that all six ramps be constructed.

It is the Plaintiffs' position that the resurfacing of the intersecting state highway is an alteration that affects the usability of the entire intersection, requiring that all six ramps be installed. Therefore, Plaintiffs request that the Court issue an order requiring PennDOT to install 6 curb ramps at such "T" intersections.

Respectfully submitted,

HEBERLE & FINNEGAN, PLLC.

By   /s/ J. Mark Finnegan
    J. Mark Finnegan, Esquire
    Attorney for Plaintiffs
    2580 Craig Road
    Ann Arbor, Ml  48103
    (734) 302-3233

ELDERKIN LAW FIRM

By   /s/ Craig A. Markham
    Craig A. Markham, Esquire
    Attorney for Plaintiffs
    150 East Eighth Street
    Erie, Pennsylvania 16501
    (814) 456-4000

12.

13.