IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VOICES FOR INDEPENDENCE, ET AL., } | |
| } | |
| Plaintiffs, } | |
| } No. 06-78 Erie | |
| vs. } Judge McLaughlin | |
| } | |
| COMMONWEALTH OF PENNSYLVANIA } | |
| DEPARTMENT OF TRANSPORTATION, } | |
| ET AL., } | |
| } | |
| Defendants. } | |

**STATE DEFENDANTS' RESPONSE TO**
**PLAINTIFFS' MOTION RESPECTING PENNDOT'S VIOLATIONS OF**
**SETTLEMENT AGREEMENTS REGARDING OMITTED CURB RAMPS**

AND NOW, come the Defendants, Commonwealth of Pennsylvania Department of Transportation ("PennDOT") and Biehler ("the State Defendants"), by their attorneys, Scott A. Bradley, Senior Deputy Attorney General, and Gregory R. Neuhauser, Chief Deputy Attorney General, Chief Litigation Section, and respond to Plaintiffs' Motion Respecting PennDOT's Violations of Settlement Agreements Regarding Omitted Curb Ramps as follows:

**INTRODUCTION**

1. It is Admitted that the Parties have entered into several Settlement Agreements in this matter; however, the Settlement Agreements speak for themselves.

2. It is Admitted that PennDOT omitted curb ramps during the initial years of the Settlement Agreements; however, PennDOT avers that this was not intentional or purposeful in the sense that PennDOT was attempting to evade the consequences of the Settlement Agreements. Rather, as has been stated previously, PennDOT has acknowledged that it did not install the omitted curb ramps based on positions previously

taken but now abandoned.  Indeed, as has been stated before, this litigation has been an evolutionary process which has moved PennDOT a significant way from its initial positions, progressing at times from misconceptions and/or differing interpretations of the intent of the Settlement Agreement(s) from both PennDOT's and the Plaintiffs' respective perspectives.  See State Defendants' Response to Plaintiffs' Motion to Enforce Settlement Agreements (Doc. # 64), at 2.

Moreover, PennDOT would note that, although representatives for PennDOT and the Plaintiffs have participated in several discussions and conducted a number of field visits related to this litigation since 2007; it wasn't until 2010 that the issue of the omitted ramps surfaced.  Nevertheless, as soon as this issue was raised, PennDOT entered into negotiations with the Plaintiffs to resolve this issue, agreeing very early in the process that most of the curb ramps identified would need to be installed.  Indeed, as the Plaintiffs note, the Parties entered into a subsequent Settlement Agreement which addresses these "omitted curb ramps."  See (Docs. # 57-58).

3.  It is Admitted that PennDOT did not file the required report within the time period designated in the Settlement Agreement.  However, PennDOT has since made the required filing.  Moreover, as previously indicated to this Court, in advance of the required date of filing with the Court –and in an effort to keep the negotiations between the Parties moving forward– PennDOT provided the Plaintiffs with a comprehensive listing beyond that required by the Settlement Agreement which provided the most current and complete inventory of omitted curb ramps for the Cities of Erie and Meadville.  See Motion to Enforce (Doc. # 59), at ¶ 7 ("In February, 2012, PennDOT did provide a listing that it described as an incomplete and unverified work-in-progress").

4. It is Admitted that PennDOT filed the document identified. It is further averred that PennDOT has met with the Plaintiffs in an effort to provide the required information and to determine what additional information the Plaintiffs require.

5. It is Admitted that PennDOT provided the identified document. It is further averred that this document was similar to a previous document provided to the Plaintiffs which addressed intersections in the City of Meadville where PennDOT believed that curb ramps could not be installed for various, identified reasons. Moreover, it is averred that both documents were prepared following a collaborative, interactive process –which included a number of discussions, meetings and site visits– with PennDOT Staff and representatives of the Plaintiffs, although not their counsel.[1] Finally, it is further averred that the Parties successfully negotiated the disposition of these curb ramp issues for the City of Meadville and it was anticipated that the same collaborative, interactive process would be utilized to address the same issues in the City of Erie. Although PennDOT attempted to pursue this same process with the City of Erie, counsel for the Plaintiffs objected to the format. PennDOT is currently attempting to revise its listing for the City of Erie and is prepared to move forward with negotiations with the Plaintiffs.

**TIME TABLE FOR RAMPS NOT IN DISPUTE**

6. Again, PennDOT has admitted responsibility for the installation of the so-called omitted curb ramps and not only agreed to install said curb ramps in the latest Settlement Agreement negotiated by the Parties, but has secured special funding in

---

[1] The process involving the City of Meadville had been conducted with the apparent approval of counsel for Plaintiffs and, as indicated, resulted in PennDOT Staff and VFI Staff negotiating a resolution of the issues. PennDOT assumed that the same process would be appropriate for the City of Erie; however, PennDOT has since been advised that no interactive discussions or meetings should take place without the approval or presence of counsel for Plaintiffs.

excess of $4 Million and has begun to schedule the installation of these omitted curb ramps. PennDOT has also apprised Plaintiff of the scheduled projects for these curb ramps and has provided information regarding the anticipated time lines for these projects.

      7. Again, it is Admitted that PennDOT has agreed to install these ramps and to do so within the time frames established by the original Settlement Agreements entered into between the Parties. PennDOT has advised the Plaintiffs that three curb ramp projects have been initiated to install the Omitted Ramps, two in Erie and one in Meadville. Under current projections, all curb ramps will either be completed or under contract by the end of 2013. Of course, PennDOT's projections assume no major obstacles to completion arise, including to unforeseen field conditions or adverse weather conditions.

      8. PennDOT objects to the entry of such an Order because, as the Plaintiffs have acknowledged in their present motion, PennDOT has already agreed to install the ramps at issue, and has already initiated its internal processes and procedures for the construction of these curb ramps and anticipate that PennDOT will meet the established completion date, except as noted above in Paragraph 7, for unforeseen field conditions or adverse weather conditions.

      9. PennDOT objects to the entry of such an Order because, as the Plaintiffs have acknowledged in their present motion, PennDOT has already agreed to install the ramps at issue, and has already initiated its internal processes and procedures for the construction of these curb ramps. Moreover, it is averred that such constraints will impose additional costs and burdens on PennDOT that could lead to the delay in the installation and construction of curb ramps such that PennDOT would not be able to

achieve its stated goal of having all of these curb ramps installed in the Cities of Erie and Meadville by the end of the 2013 construction season.

**CONSTRUCTION STANDARDS FOR OMITTED RAMPS**

10. As PennDOT has asserted previously, the only variance from the 2010 ADA Standards complained of by the Plaintiffs relates to curb ramp cross slopes exceeding 2%. However, when the scope of work is exclusively curb ramp design and construction or alterations of curb ramps on resurfacing projects, adjustments to the roadway structure are not within the project's scope of work. Consequently, the cross slope of the curb ramps will be transitioned to meet the existing roadway profile behind the curb, with no change or adjustment made to the roadway profile because it is an existing site constraint. Indeed, such an approach conforms to 2012 ADA Standard 406.5.

Specifically, the 2010 ADA Standards state as follows:

> **406.5 Location.** Curb ramps and the flared sides of curb ramps shall be located so that they do not project into vehicular traffic lanes, parking spaces, or parking access aisles. Curb ramps at marked crossings shall be wholly contained within the markings, excluding any flared sides.

2010 ADA Standards, at 406.5 Location.

PennDOT's policy of transitioning the curb ramp cross slope to meet the roadway profile behind the curb complies and is consistent with the requirement in the 2010 ADA Standards that curb ramps and flares do not project into the traffic lanes, parking spaces or parking access aisles. Thus, because 2010 ADA Standard 406.5 indicates that no part of a curb ramp shall project into the roadway or parking spaces, the 2010 ADA Standards are properly construed to mean that, unless the roadway is being reconstructed to adjust

its profile, and therefore the cross slope of the curb ramp, the roadway structure itself is not to be adjusted in front of the curb ramp.

Moreover, constructing curb ramps with a 2% cross slope all the way to the curb, when the roadway profile exceeds 2% would result in an abrupt and uneven transition from the curb ramp to the roadway surface and, according to the Plaintiffs' position, require that a portion of the ramp project into the roadway, both longitudinally and laterally, in order to transition to the roadway slope. However, the 2010 ADA Standards clearly state that no portion of the curb ramp should project into any part of the roadway. From PennDOT's perspective, this makes sense from a safety perspective because it allows the user to make the transition from the sidewalk and curb ramp cross slope to the roadway cross slope behind the curb line, *i.e.*, not in the roadway.

Additionally, PennDOT would again observe that in June of 2010, the Federal HighWay Administration[2] ("FHWA") reviewed and approved PennDOT's Roadway Construction Standards for ADA facilities (RC-67M).  More recently, the FHWA approved changes to PennDOT's Design Manual at Part 2, Chapter 6, covering Pedestrian Facilities and the Americans with Disabilities Act.  See    The approved changes included the following language:

---

[2] "The FHWA is responsible for implementation of pedestrian access requirements from the ADA and Section 504.  This is accomplished through stewardship and oversight over all Federal, State, and local governmental agencies ("public agencies") that build and maintain highways and roadways, whether or not they use Federal funds on a particular project."  See State Defendants' Response to Plaintiffs' Motion to Enforce Settlement Agreements (Doc. # 64), at 8-9 (*citing* FHWA, Office of Civil Rights, Memorandum, September 12, 2006).  As also noted in that initial response, "PennDOT … works closely with the FHWA in many of its road construction projects and quite often looks to the FHWA for guidance and assistance on matters relating to design, construction and safety."  Id., at 8.

> Resurfacing projects and "curb ramp only" projects do not typically include changes to roadway geometry, including roadway profile grade. When the roadway profile grade exceeds 2%, and profile adjustments are not in the scope of work, the depressed curb must be constructed to match the roadway profile and the curb ramp cross slope will transition to meet the roadway profile grade as gradually as possible, but not to exceed a rate of change of 3% per LF. In normal crown sections, stormwater flow must be maintained along the curb line and the roadway should not be adjusted in any way that would alter the flow line. Transitioning the curb ramp cross slope to the roadway profile allows the pedestrian to adjust to the cross slope of the crosswalk in the safety of the area behind the curb and does not push stormwater into the vehicular path. Curb ramps and the flared sides of curb ramps shall be located so that they do not project into vehicular traffic lanes, parking spaces, or parking access aisles.

PennDOT, Publication 13M (DM-2), at Chapter 6—Pedestrian Facilities and the Americans with Disabilities Act, at ¶ A (attached hereto as Exhibit G). See also Id., at ¶¶ B.8, B.18, D.5, and D.7.

Accordingly, PennDOT believes that its present approach to roadway profile issues is not inconsistent with the 2010 ADA Standards. The 2010 ADA Standards were developed and implemented primarily for buildings and developed sites. However, the Public Right-of-Way creates unique issues and problems neither contemplated nor addressed by the 2010 ADA Standards. Indeed, the Access Board has been developing a separate set of guidelines to specifically apply in the Public Right-of-Way. Thus, the 2010 ADA Standards do not have any provisions addressing curb ramp cross slope at a roadway interface when the roadway profile exceeds 2%. Consequently, in the first instance, the 2010 ADA Standards do not fully address the issue of curb ramp cross slope transitioning to meet existing roadway profiles in excess of 2%.

Further, PennDOT's policy conforms to the 2010 ADA Title II Regulations Part 35 Nondiscrimination on the Basis of Disability in State and Local Government Services

(as amended by the final rule published on September 15, 2012) section 35.151 New construction and alterations, (iii) Disproportionality.  Particularly, when the scope of work is exclusively curb ramp design and construction or alterations of curb ramps on resurfacing projects, adjustments to the roadway structure are not within the project's scope of work.  To properly adjust the roadway profile requires full reconstruction of the roadway, simple milling and resurfacing does not accomplish this.  Reconstruction involves excavating the sub base, adjusting/relocating drainage inlets, reconstruction of a portion of the local road to tie in new elevations, driveway adjustments and possibly utility relocations and possibly Right-of-Way acquisition.  All of which are far beyond the scope of work for resurfacing, thereby making costs associated with reconstructing the roadway structure alteration disproportionate to the cost of altering (resurfacing) the primary function area (the curb ramp and crosswalk).

Nevertheless, as understood and implemented by PennDOT, these standards require PennDOT to assess pedestrian needs and improve or upgrade altered existing facilities to the latest ADA standards.  Where existing site constraints limit the ability to fully meet the latest ADA standards, the improvements or upgrades must be done to provide access to the maximum extent feasible.  This, as detailed above, PennDOT is doing.

11. Notwithstanding the Plaintiffs description of an "unresolved dispute between the parties as to whether PennDOT must install a total of six compliant ramps at unsignalized 'T' intersections involving city-owned roadways," PennDOT would aver that the terms of the original Settlement Agreements currently establish PennDOT's obligation at "unsignalized 'T' intersections involving city-owned roadways" in the

Cities of Erie and Meadville. Under the terms of those agreements, PennDOT is obligated to provide curb ramps serving the crossings of the state road, and must only install curb ramps serving the crossings of the city-owned roadway when PennDOT " … is altering or resurfacing a street, curb ramp or sidewalk *and substantially encroaches on the intersecting street of the other entity and triggers duties under the ADA, the obligation to ensure affected ramps are ADA compliant falls on the encroaching entity*." See Settlement Agreement (City of Erie) (Doc. # 32), at ¶ 2(c) ("Cross Triggering between Defendants"); Settlement Agreement (City of Meadville) (Doc. # 22-1), at ¶ 2.a. ("Cross Triggering between Defendants") (emphasis added).

      Accordingly, PennDOT would move to strike all parts of the present paragraph as being in violation of Federal Rule of Evidence 408, relating to Compromise Offers and Negotiations, because the averments of this paragraph relate to positions PennDOT has taken with respect to efforts to negotiate a compromise with respect to the treatment of curb ramp installation at unsignalized "T" intersections involving city-owned roadways.

      12.  Under the terms of the prior Settlement Agreements entered into between the Parties, PennDOT is obligated to provide curb ramps serving the crossings of the state road, and must only install curb ramps serving the crossings of the city-owned roadway when PennDOT " … is altering or resurfacing a street, curb ramp or sidewalk and substantially encroaches on the intersecting street of the other entity and triggers duties under the ADA, the obligation to ensure affected ramps are ADA compliant falls on the encroaching entity." PennDOT will continue to meet its obligations as established by the prior Settlement Agreements with respect to the treatment of curb ramp installation at unsignalized "T" intersections involving city-owned roadways, except where

circumstances and/or conditions (e.g., driveways, inadequate sight distance, etc.) prevent the installation of curb ramps.[3]  Local curb ramps will be provided by PennDOT only in the event –as set forth in the Settlement Agreements– that PennDOT's work has disturbed or otherwise triggered the local ramps.

13.   PennDOT certainly respects the Plaintiffs' stated position on this issue; however, the prior Settlement Agreements establish PennDOT's obligation with respect to the treatment of curb ramp installation at unsignalized "T" intersections involving city-owned roadways in the Cities of Erie and Meadville.  Accordingly, PennDOT objects to such an Order as had been requested because it would provide the Plaintiffs with more than they bargained for when entering into the respective Settlement Agreements in this matter.

**PENNDOT MUST INSTALL ALL OF THE DISPUTED RAMPS**

14.   It is Admitted that the Settlement Agreements so state.  However, as previously averred, PennDOT entered into a process with the Plaintiffs to address this issue in the City of Meadville and apparently were successful in coming to a resolution. PennDOT anticipated that the same process would be utilized for the City of Erie.

15.   It is Admitted that the Settlement Agreements so state.  However, as previously averred, PennDOT entered into a process with the Plaintiffs to address this issue in the City of Meadville and apparently were successful in coming to a resolution. PennDOT anticipated that the same process would be utilized for the City of Erie.

16.   It is Admitted that the stated reference to 28 C.F.R. Part 36, App. § 4.1.6(j) Definitions has been accurately quoted.  However, PennDOT would suggest that this is

---

[3] Of course, PennDOT will continue to seek to work in collaboration with Plaintiffs and their counsel in resolving any issues that should arise in this context.

another instance reflective of the problem when using ADAAG in situations for which it was not specifically designed.  The definition recited specifically talks about "an alteration of a building or a facility…"  It does not explicitly address the situation confronted by PennDOT where a curb ramp must be installed in a situation where there is an existing roadway profile that will require a transition between the existing cross slope of the roadway and the newly installed curb ramp.

17. PennDOT again admits that the Settlement Agreement so states.  However, it is again averred that PennDOT entered into good faith negotiations with the Plaintiffs to resolve these issues and were in fact successful in doing so in the City of Meadville.  The Plaintiffs have objected to the use of this same process in the City of Erie; accordingly, PennDOT is attempting to pursue these issues through the stated terms of the Settlement Agreement.  Additionally, PennDOT has submitted several TIFs to the Plaintiffs; however, counsel for the Plaintiffs have indicated that they will categorically deny all requested TIFs for cross slope deviation.

18. PennDOT again admits that the Settlement Agreement so states.  However, it is again averred that PennDOT entered into good faith negotiations with the Plaintiffs to resolve these issues and were in fact successful in doing so in the City of Meadville.  The Plaintiffs have objected to the use of this same process in the City of Erie; accordingly, PennDOT is attempting to pursue these issues through the stated terms of the Settlement Agreement.

19. PennDOT denies that it has committed repeated violations of the settlement agreements.  Moreover, PennDOT objects to the issuance of the requested Order.  Initially, the Plaintiffs acknowledge that PennDOT has already committed "that the vast

majority of all of these omitted ramps will be installed by the end of the 2013 construction season." See (Doc. # 68), at ¶ 8.[4]  This is also consistent with the timeline identified in the Third Settlement Agreement.  See (Doc. # 51), at ¶ II. C. ("… and all such work shall be completed by January 1, 2014").  Moreover, PennDOT has provided the Plaintiffs with information regarding the scheduled projects for these curb ramps.  Thus, there is no need for entry of the Order requested.

WHEREFORE, the State Defendants respectfully request that Plaintiffs' Motion Respecting PennDOT's Violations of Settlement Agreements Regarding Omitted Curb Ramps be denied.

                      Respectfully submitted,

                      LINDA L. KELLY
                      Attorney General

                      s/ Scott A. Bradley

Office of Attorney General        Scott A. Bradley
6th Floor, Manor Complex        Senior Deputy Attorney General
564 Forbes Avenue        Attorney I.D. No. 44627
Pittsburgh, PA 15219
Phone: (412) 565-3586        Gregory R. Neuhauser
Fax:   (412) 565-3019        Chief Deputy Attorney General

Date:  August 30, 2012

---

[4] Indeed, the heading of this section of the Plaintiff's Motion is "Time Table for Ramps Not In Dispute."