IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VOICES FOR INDEPENDENCE, ET AL., | } |
| Plaintiffs, | } No. 06-78 Erie |
| vs. | } Judge McLaughlin |
| COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF TRANSPORTATION, ET AL., | } |
| Defendants. | } |

BRIEF IN SUPPORT OF STATE DEFENDANTS' RESPONSE TO
PLAINTIFFS' SECOND MOTION RESPECTING PENNDOT'S VIOLATIONS
OF SETTLEMENT AGREEMENTS REGARDING OMITTED CURB RAMPS

AND NOW, come the Defendants, Commonwealth of Pennsylvania Department of Transportation ("PennDOT") and Biehler ("the State Defendants"), by their attorneys, Scott A. Bradley, Senior Deputy Attorney General, and Gregory R. Neuhauser, Chief Deputy Attorney General, Chief Litigation Section, and submit the following Brief in Support of their Response To Plaintiffs' Second Motion Respecting PennDOT's Violations of Settlement Agreements Regarding Omitted Curb Ramps:

**INTRODUCTION**

The Plaintiffs filed a Second Motion to Enforce Settlement Agreements after the State Defendants responded to their initial Motion to Enforce. Although the Plaintiffs indicated at the Status Conference convened by the Court that this Second Motion to Enforce was a refinement of their position based on the prior response provided by the State Defendants, it nevertheless appears that the crux of the dispute between the Parties

remains their respective positions on what has been referenced throughout as the 2% cross slope or roadway profile issue.

Yet, the Plaintiffs focus much of their Second Motion to Enforce on other issues, including the listed inventories of "Omitted Ramps" for the Cities of Erie and Meadville, the time for completion of the installation projects for these "Omitted Ramps," the list of "Barriers to Remain" for the Cities of Erie and Meadville and the TIF process. However, it is the position of the State Defendants that these issues could be amicably resolved by the Parties through discussion and negotiation once the 2% cross slope or roadway profile issue is resolved.

Nevertheless, the State Defendants will offer some comments about these other issues and then address the 2% cross slope or roadway profile issue.

**TIME TABLE FOR RAMPS NOT IN DISPUTE**

The Plaintiffs first take issue with the PennDOT curb ramp inventories for the Cities of Erie and Meadville required by the Fourth Settlement Agreement. Again, PennDOT has admitted that the documents were not timely filed with the Court; however, the documents were provided to the Plaintiffs for review and discussion prior to the required filing date. Further, the documents have since been filed with the Court.

To the extent that the Plaintiffs take further issue with these documents, these were substantial undertakings and PennDOT has endeavored to ensure that the lists were compiled with completeness and accuracy as the ultimate goals. Nevertheless, given the scope and magnitude of the task, PennDOT acknowledges there may be mistakes and/or omissions included in the final submission. Moreover, PennDOT has been –and will always be– willing to meet with the Plaintiffs and their counsel to answer any questions

or address any issues regarding these documents specifically or the litigation generally. Indeed, even after the filing of the initial Motion to Enforce, PennDOT met with the Plaintiffs for the purpose of addressing questions raised by the Plaintiffs concerning these curb ramp inventories.

To the extent that the Plaintiffs seek a court-ordered deadline for the installation of curb ramps in the Cities of Erie and Meadville, PennDOT would respond that such is not necessary because PennDOT's stated goal is to have the curb ramps installed within the timeframe contemplated by the Parties.  PennDOT has pledged that the remaining curb ramps in the Cities of Erie and Meadville will be installed by the end of the 2013 construction season.  The Plaintiffs have acknowledged this by heading a portion of their Second Motion to Enforce "TIME TABLE FOR RAMPS NOT IN DISPUTE."  Further, PennDOT has provided the Plaintiffs with documentation showing the schedules for implementation and completion of the various projects which include the curb ramp installations for the Cities of Erie and Meadville.  Indeed, based on current projections, the latest completion date for the three curb ramp projects to address the omitted ramps is July of 2013.  There is more than adequate contingency time in the schedule.

**CONSTRUCTION STANDARDS FOR OMITTED RAMPS**

In the next portion of the Second Motion to Enforce, the Plaintiffs interject an issue regarding PennDOT's obligation to install curb ramps at unsignalized T-intersections.  By their averments, the Plaintiffs seek an Order or Court requiring PennDOT to install curb ramps serving all three crossings of unsignalized T-intersections, for a total of six curb ramps at each unsignalized T-intersection.  However, as this Court is well aware, the present settlement agreements for the Cities of Erie and

Meadville were predicated upon the idea that, as between PennDOT and the local entities, each agency would install the curb ramps only for the crossings of their respective streets, unless that agency's work encroached or otherwise triggered the obligation to install curb ramps serving the crossings of the other entity's street. The Plaintiffs now want the Court to direct that PennDOT install all required curb ramps at an intersection, even though PennDOT's work may not encroach or otherwise trigger an obligation in PennDOT to construct the curb ramps serving the crossing of the local street. This is in express contravention of the obligations placed on PennDOT and the Cities of Erie and Meadville in the relevant Settlement Agreements.

**PENNDOT MUST INSTALL ALL OF THE DISPUTED RAMPS**

As part of the negotiations between the Parties, PennDOT provided the Plaintiffs with a list of curb ramps at several intersections in the City of Meadville where PennDOT believed it would not be prudent or practical to install curb ramps. See Exhibit A (Hall Letter, May 21, 2012)(attached hereto). The list was entitled Proposed Barriers for the City of Meadville Curb Ramp Project. It was agreed that representatives from both Parties would participate in field views of the intersections and a consensus on these sites was reached for the City of Meadville. See Exhibit B (MINUTES)(attached hereto). PennDOT undertook the same approach for the City of Erie and had a field view with representatives from VFI and came to agreement on all of the areas where it was planned to not provide a pedestrian crossing of state roads in the City of Erie. See Exhibit C (Hall Letter, July 21, 2012)(attached hereto). PennDOT accordingly provided the Plaintiffs with a similar list of Proposed Barriers for the City of Erie Curb Ramp Project. Nevertheless, in a letter dated June 21, 2012, and at a subsequent meeting with the

Plaintiffs, PennDOT was advised that this process would not be acceptable.  Accordingly, PennDOT is in the process of reviewing the list for the City of Erie and will provide said list to the Plaintiffs when it is completed.   PennDOT remains willing to negotiate the issues related to this list and believe that such issues can be agreed upon between the Parties, because these issues have been previously negotiated between the Parties in the course of this litigation.

**2% CROSS SLOPE OR ROADWAY PROFILE**

Although seemingly relegated to a single paragraph in the present motion to enforce, the 2% cross slope or roadway profile issue remains the largest point of contention between the Parties.  PennDOT has set forth its position on this question in the Response to Plaintiffs' (First) Motion to Enforce Settlement Agreement (Doc. # 64).  That Response is incorporated herein as if set forth in full.  As asserted therein, PennDOT believes that its policy in this regard, –grounded in sound engineering principles and judgment as it is– is a reasonable and practical interpretation and application of the 2010 ADA Standards in a real world context.  However, in a further effort to demonstrate a logical and sound basis for its position, PennDOT seeks to present the Court with additional information to support its position on this issue.

Initially, PennDOT would again observe that in June of 2010, the Federal HighWay Administration[1] ("FHWA") reviewed and approved PennDOT's Roadway

---

[1] "The FHWA is responsible for implementation of pedestrian access requirements from the ADA and Section 504.  This is accomplished through stewardship and oversight over all Federal, State, and local governmental agencies ("public agencies") that build and maintain highways and roadways, whether or not they use Federal funds on a particular project."  See State Defendants' Response to Plaintiffs' Motion to Enforce Settlement Agreements (Doc. # 64), at 8-9 (citing FHWA, Office of Civil Rights, Memorandum, September 12, 2006).  As also noted in that initial response, "PennDOT … works closely

5

Construction Standards for ADA facilities (RC-67M).  See Exhibit D (Melville Decl.), at Melville Exhibit 1 (attached hereto).  More recently, the FHWA approved changes to PennDOT's Design Manual at Part 2, Chapter 6, covering Pedestrian Facilities and the Americans with Disabilities Act.  See Exhibit G (Gillespie Letter, June 26, 2012)(attached hereto).  The approved changes included the following language:

> Resurfacing projects and "curb ramp only" projects do not typically include changes to roadway geometry, including roadway profile grade.  When the roadway profile grade exceeds 2%, and profile adjustments are not in the scope of work, the depressed curb must be constructed to match the roadway profile and the curb ramp cross slope will transition to meet the roadway profile grade as gradually as possible, but not to exceed a rate of change of 3% per LF.  In normal crown sections, stormwater flow must be maintained along the curb line and the roadway should not be adjusted in any way that would alter the flow line.  Transitioning the curb ramp cross slope to the roadway profile allows the pedestrian to adjust to the cross slope of the crosswalk in the safety of the area behind the curb and does not push stormwater into the vehicular path.  Curb ramps and the flared sides of curb ramps shall be located so that they do not project into vehicular traffic lanes, parking spaces, or parking access aisles.

PennDOT, Publication 13M (DM-2), at Chapter 6—Pedestrian Facilities and the Americans with Disabilities Act, at ¶ A.  See also Exhibit G., at ¶¶ B.8, B.18, D.5, and D.7.

The remaining information comes largely in the form of two affidavits.  The affidavits are from engineers, one of whom is involved in a consulting role with PennDOT and the other of whom is independent of PennDOT.  The first affidavit is from David Melville.  See Exhibit D (Melville Decl.)(attached hereto).  Melville is presently employed as a senior project manager by Greenhorne & O'Mara, a consulting

---

with the FHWA in many of its road construction projects and quite often looks to the FHWA for guidance and assistance on matters relating to design, construction and safety." Id., at 8.

6

engineering company; he holds a Bachelor of Science degree in Structural Engineering from Penn State University. Melville Decl., at ¶¶ 1-2. Melville has over twenty years of experience in engineering and construction management. Melville Decl., at ¶¶ 3-4.

In his current assignment for Greenhorne & O'Mara, Melville has worked primarily on PennDOT's program for Americans with Disabilities Act (ADA) compliance. In this role he has gained extensive experience in the requirements of the Americans with Disabilities Act (ADA) and the guidance for work in the public right-of-way developed by the U.S. Access Board and the public right-of-way policies of the Federal Highway Administration (FHWA). Melville Decl., at ¶ 5.

Melville is familiar with the present litigation, particularly the disagreement between the Parties with respect to the 2% cross slope or roadway profile issue. Melville is also familiar with the development of PennDOT's approach to this issue. Melville Decl., at ¶ 6. As he states in his affidavit:

> 7. PennDOT's revised ADA policy was first released November 14, 2008. In the summer of 2009, engineers in PennDOT's Central Office in Harrisburg, PA discovered instances of curb ramps being constructed at the maximum 2% cross slope when the roadway profile exceeded 2%. The engineers at PennDOT were immediately concerned about stormwater drainage as well as pedestrian and vehicular safety.
>
> 8. In July or August of 2009 PennDOT began an effort to investigate options for constructing curb ramps when the roadway profile exceeds 2%. This included consultation with Voices for Independence (VFI). The goal was to develop and implement a standard for statewide use. VFI representatives Allen Dunfee (Director of Advocacy and Independent Living) and Rick Hoffman (Advocacy Specialist) traveled to Harrisburg to discuss this issue. Christopher Drda, P.E., Central Office ADA Coordinator at the time, and I met with Mr. Dunfee and Mr. Hoffman. The issue of matching roadway profile was discussed. Mr. Dunfee agreed that keeping stormwater against the curb was the right thing to do.

      Allen recommended that the curb ramp transition to meet the roadway profile at a rate of change no greater than 3% per lineal foot.

9. PennDOT continued to investigate the issue of curb ramp cross slope with the U.S. Access Board and other state departments of transportation (DOT's).  The U.S. Access Board advised PennDOT that alterations are to be done to the maximum extent feasible and that matching roadway profile is reasonable when the project's scope of work involves only resurfacing and/or curb ramps.

10. Michigan DOT informed PennDOT that Michigan DOT's practice is to match the roadway profile and that its standard construction details provide for this approach.  Kentucky DOT indicated they would match roadway profile and document any deviations from the Public Right-of-Way Accessibility Guidelines (PROWAG).

11. In the fall of 2009 Central Office Staff decided altering the flow line negatively impacts the proper function of the road and curb ramps should be installed to transition the cross slope as gradually as possible to match the roadway profile but not to exceed a transition rate of 3% per lineal foot (LF).

12. In October of 2009, Central Office tried to contact Allen Dunfee to review the new policy.  Mr. Dunfee was off work for an extended leave.

13. In March 2010, Allen Dunfee and Rick Hoffman again came to Central Office to review the cross slope policy.  Again Mr. Dunfee agreed with PennDOT's proposal.   On April 5, 2010 Mr. Dunfee sent an email stating that matching the roadway profile is not acceptable and that alterations to the road must be done whenever the roadway profile exceeds 2%.

14. RC-67M, PennDOT's Roadway Construction Standards for curb ramps and sidewalks, was updated to indicate the depressed curb should match the roadway profile and transition at a rate not to exceed 3% per LF.  The Federal Highway Administration (FHWA) approved Publication 72M, which contains RC-67M, and it was released in June 2010. <u>See</u> Melville Exhibit 1.

Melville Decl., at ¶¶ 7-14.

Melville then details his understanding of the issue from an engineering perspective within the context of the present litigation, and offers some conclusions for the Court's consideration:

> 15. From May 2010 to April 2012 PennDOT and VFI met numerous times to discuss various topics. The issue of matching roadway profile was discussed many times. PennDOT explained that significant work such as adjusting drainage inlets, driveway adjustments, adjusting local roads to tie in elevation changes, potential utility relocation and possible need for right-of-way acquisitions is required to properly adjust a roadway's profile. When a project's scope of work involves only resurfacing and/or curb ramp construction, the extensive work required to properly adjust a roadways profile is not part of the project and, in these projects, the roadway profile is an existing site constraint creating a Technically Infeasible condition. PennDOT also explained its safety related reasons for curb ramp cross slope matching the roadway profile.
>
>> It keeps stormwater out of the vehicle path to prevent hydroplaning and icing hazards
>>
>> Pedestrians can adjust to the roadway profile behind the curb, not in the roadway
>>
>> Drivers have an expectation of a smooth plane to drive on

Melville Decl., at ¶ 15.

Additionally, Melville states that he has informally surveyed a number of other States' Departments of Transportation to assess whether PennDOT's policy falls within the mainstream of the industry's current approach to this problem. Melville reports that the majority of States canvassed that have considered or confronted the issue have indicated that the curb ramp cross slope should be adjusted behind face of curb to meet the roadway profile rather than having the roadway altered to meet the curb ramp cross slope of 2.0% or less. See Melville Decl., at ¶ 17. For example, the Michigan

Department of Transportation has stated that "For new roadway construction, the ramp cross slope may not exceed 2%. For alterations to existing roadways, the cross slope may be transitioned to meet an existing roadway grade. The cross slope transition shall be applied uniformly over the full length of the ramp." Similarly, after initially noting that "[t]he maximum cross slope of curb ramps shall be 2%," the Illinois Department of Transportation states that "[a]t pedestrian street crossings the cross slope at the bottom of the ramp shall be permitted to equal the street or highway grade."[2]

The Wisconsin Department of Transportation ("WSDOT") provides a more concrete example. In a document entitled MEF Template, WSDOT sets forth a hypothetical analysis of the criteria that would apply to the pedestrian elements on a highway reconstruction project that will be built to the maximum extent feasible. See Melville Decl., at Melville Exhibit C. As the stated justification for deviating from the 2% cross slope requirement, WSDOT states the following:

> To construct the curb ramps to be 100% compliant would require re-profiling the existing roadway. This type of major reconstruction is not feasible in this type of Alteration project.
>
> To construct the curb ramps while maintaining the existing profile of the roadway would require rebuilding the roadway adjacent to the proposed curb ramps. The rebuilt roadway would not eliminate the transition from the 2% cross slope of the curb ramps as it matches into the steeper cross slopes of the existing crosswalks but would simply move the transition further into the

---

[2] See Michigan Department of Transportation, Bureau of Highway Development, *Standard Plan for Sidewalk Ramp and Detectable Warning Details*, at Sheet 7 of 7, which may be found at the following link:
http://www.aatwp.org/details/MDOT%20sidewalk%20ramps.pdf and Illinois Department of Transportation, Division of Highway, *Bureau of Design and Environment Manual*, Ch. 58 (Special Design Elements), 58-1.13 (which may be found at the following link: http://dot.state.il.us/desenv/BDE%20Manual/BDE/pdf/Chapter%2058%20Special%20Design%20Elements.pdf).

>   active traveled roadway. The result would be a grade change transition within the driving lane that would be undesirable.

Melville Decl., at Exhibit C, at 3.

This approach is consistent with PennDOT's policy and the position PennDOT is advocating to this Court with respect to situations where PennDOT is simply repaving a state road where the roadway profile exceeds 2% along the curb line.

PennDOT has also secured an affidavit from Keith A. Bergman, P.E. See Exhibit E (Bergman Decl.)(attached hereto). Bergman's C.V. identifies him as a "Consulting Engineer in Civil Engineering, specializing in Highway and Street Design, Traffic Engineering, Utilities Construction, Storm Drainage, Pedestrian Safety, Walkway Surface Evaluations, Concrete and asphalt, Pavement Evaluations[, with e]xtensive experience in Construction Management, Project Related Claims, Job Site Safety, Codes and Standards, ADA Compliance." See Exhibit F (CV of Keith A. Bergman, P.E.)(attached hereto).

Bergman explains his understanding of PennDOT's approach to the roadway profile issue as follows:

>   PennDOT has taken the position that the curb ramp cross slope should transition to meet the roadway profile as gradually as possible, and at a rate not to exceed 3% change in cross slope per linear foot; however, the roadway profile is not to be adjusted to ensure that the curb ramp maintains a cross slope of 2% or less. Pictorially, this is shown in attached Exhibit 1 where the newly constructed curb ramp cross slope transitions from the 2% cross slope at the top of the curb ramp to the 14% roadway grade at the bottom of the curb ramp. The contrary to this approach is shown pictorially in Exhibit 2 where the curb ramp cross slope is held at 2% which then requires pavement extension into the roadway.

Bergman Decl., at ¶ 9, Exhibits 1-2.

Bergman then observes that "[t]he extension of pavement into the roadway creates a series of potential hazards. Adjustments to the roadway in front of the curb

11

ramp alters the stormwater flow, which will create the potential for hydroplaning by vehicles (cars, motorcycles, bicycles, etc.) in warmer weather or icy patches in colder weather. Pictorially, this condition is shown in the attached Exhibits 3, 4, and 5, where the stormwater flows away from the curb line and out into the travel way." Bergman Decl., at ¶ 10, Exhibits 3-5.

Accordingly, Bergman offers the following conclusions:

11. Existing roadway constraints, including terrain conditions, utilities, buildings, stormwater drainage issues, and traffic control devices must be considered when planning, designing and constructing a project so as to not create additional hazards.

12. In the context of remediating curb ramps at intersections where no reconstruction of the roadway is being undertaken, the curb ramp cross slope should be transitioned to meet the roadway profile, rather than adjusting the roadway profile to match a curb ramp cross slope of 2% or less.

   a. Roadways are generally designed to carry stormwater along the curb lines and out of the path of vehicular traffic. This is evident by the crown of the roadway being at the center of the roadway for a typical roadway cross section.

   b. The roadway crown is intended to avoid the collection of water in the vehicular path. Pictorially this is shown in Exhibits 6 and 7, where a modest adjustment to the roadway profile along the curb ramp area forces water away from the curb line into the travel way. The stormwater then proceeds across the roadway crown and not into the intended inlet. This condition creates a hazard for other roadway users.

   c. Having the pedestrian adjust to (or from) the roadway profile behind the curb is safer than making that adjustment in the roadway. If an accident were to occur, the pedestrian is safer behind the curb than within the roadway area.

      d.    Motorists have an expectation of a smooth plane surface to drive on. Adjustments or warping of the roadway profile in the area around a curb ramp creates a hazard when a vehicle traverses it. Pictorially this is shown in Exhibits 8 and 9, where the roadway profile adjustment has been made at the intersection and for right turning vehicles (including cars, motorcycles, bicycles, etc.). The absence of having vehicles reasonably expect the change in profile grade precipitates the hazard. Had the curb ramp shown in Exhibits 8 and 9 been constructed with the transition occurring along the curb ramp, this condition would have been avoided.

Bergman Decl., at ¶ 11-12, Exhibits 6-9.

      Bergman's affidavit also considers the application of current ADA standards in the current situation. After articulating the relevant standards, Bergman concludes that "condition of the roadway slope (terrain) makes strict compliance with the 2010 ADA Standards for Accessible Design structurally impractical without creating, albeit unintended, hazards for the other roadway users." Bergman Decl., at ¶ 19. He then notes that the approach contemplated by the Architectural and Transportation Barriers Compliance Board ("Access Board") in its proposed Public Right of Way Accessibility Guidelines (PROWAG) allows entities much greater flexibility when addressing the roadway profile issue. See Bergman Decl., at ¶¶ 20-26.

WHEREFORE, it is respectfully requested that this Court deny Plaintiffs' Second Motion to Enforce Settlement Agreements (Doc. # 68).

                                                        Respectfully submitted,

                                                        LINDA L. KELLY
                                                        Attorney General

                                                        _s/ Scott A. Bradley_

| | |
|---|---|
| Office of Attorney General | Scott A. Bradley |
| 6th Floor, Manor Complex | Senior Deputy Attorney General |
| 564 Forbes Avenue | Attorney I.D. No. 44627 |
| Pittsburgh, PA 15219 | |
| Phone: (412) 565-3586 | Gregory R. Neuhauser |
| Fax:   (412) 565-3019 | Chief Deputy Attorney General |

Date:   August 30, 2012